TATE, Judge.
In 1948, Donat Mire sold ninety acres of land in Acadia Parish to the defendant Miller. This suit was filed ten years later by the heirs of Mire, who had died in 1954, *768 to reform the deed. It is alleged that through error and mutual mistake the deed did not reflect the true intent of the parties that one-fourth of the minerals under the land sold be reserved for the seller, Mire.
The plaintiffs appeal from the dismissal of their suit. (Miller died after the trial below, and his legal heirs have been substituted as defendants.)
The legal principles applicable to this suit were recently re-stated in Merritt v. Hays, 237 La. 557, 111 So.2d 771, 773:
“ ‘The law respecting reformation of instruments is well settled here and elsewhere. It is an equitable remedy and lies only to correct mistakes or errors in written instruments when such instruments, as written, do not express the true contract of the parties. * * * It is a personal action, even when applied to real estate * * *, in which the burden is on the one seeking reformation to establish the mutual error and mistake by clear and convincing proof, parol evidence being admissible for this purpose. * * * [The] plaintiff carries the burden of proof and that the evidence of mutual error must be strong and convincing. * * * ’ ”
As the Merritt case holds, in a reformation suit “the strongest proof possible should be produced”, 111 So.2d 773, and “the courts should exercise great caution and require a high degree of proof”, 111 So.2d 774.
Succinctly, the principal issue before us on this appeal is whether the plaintiffs have carried their burden of proving that the parties to the sale intended for Mire to retain a one-fourth mineral interest at the time they executed the deed by which Mire sold the land to the defendant Miller.
The trial court found that the parties to the 1948 deed had discovered that it did not contain any mineral or mineral royalty reservation before they executed it, and that Mire willingly had nevertheless executed the document, thereby expressly consenting to a modification of any previously intended agreement so as to conform it with the written deed by which the land was conveyed free of any mineral or mineral royalty reservation. We find no error in this conclusion.
The defendant Miller was the only witness testifying as to the original transaction between the parties. He frankly admitted that he and Mire had first agreed to the sale of the land, subject to a one-fourth of one-eighth, or a one-thirty-second, mineral royalty (not a mineral) reservation in Mire’s favor. However, when the parties went to the office of the attorney who had prepared the sale per prior instructions, the deed as written did not contain the intended royalty reservation. This, the defendant testified, was called to the attention of both the parties in the presence of the notary who subsequently passed the sale (who was a law partner of the attorney to whom the instructions as to preparation of the sale had been given a few days before). Mire then specifically relinquished the intended royalty reservation and then voluntarily executed the deed as written without the reservation, because he did not want any further delay in completing the transaction. (The attorney who had been employed to handle the matter was absent from the office at the time.)
There is no contradiction to Miller’s testimony that, before signing the deed, Mire specifically waived the royalty reservation he had originally intended to reserve. (Although the notary who passed the deed and in whose presence the incident took place is still practising law in Crowley where the trial was held, he was not called to testify, nor was the failure to call him explained. As stated, the burden was on the plaintiffs to prove error, not on the defendant to negative it.)
At the time the land was sold in 1948, it was not leased, and there was no mineral production nearby; ■ a mineral reservation *769 was only of speculative value. It is also uncontradicted, that, between the sale in 1948 and Mire’s death in 1954, Mire made no claim of having reserved any mineral or mineral royalty interest in the land sold.
In attempting to prove that by mutual error an intended mineral reservation in Mire’s favor was not included in the 1948 deed, the plaintiffs rely upon certain actions by the defendant Miller in 1955, immediately before oil was discovered on the former Mire tract. Without any prior claim having been made by the Mires, the defendant Miller went to some of them before drilling commenced and (according to his own account) stated that, even though the seller Mire had relinquished any right to a royalty reservation before executing the deed, nevertheless he, Miller, felt a moral obligation in view of the circumstances surrounding the sale either to convey (if production resulted) the one-thirty-second mineral royalty interest their father had originally intended to reserve, or else to sell at once such mineral royalty interest, if the heirs wished, and to share the proceeds with them. (Miller was willing to donate to the heirs the same interest they would have obtained had their ancestor insisted on the mineral royalty reservation in the 1948 deed, which reservation under our mineral law expired in 1958 if there was no production within ten years of the date of reservation.)
According to Miller, the Mire heirs preferred to sell the royalty interest he was willing to donate to them, rather than to gamble on the possibility of production. Pursuant to their choice, Miller therefore by a 1955 deed sold a one-thirty-second royalty interest for $4,275 and paid to the Mire heirs one-half of the proceeds (less his own income tax liability thereupon). Miller explained that he felt this was the value of the residual mineral royalty interest (1955-1958) which the heirs would have owned had Donat Mire reserved it in the 1948 deed, since such a reservation would have expired in 1958 if minerals were not produced before that time.[1]
It is undisputed that the heirs accepted and cashed the checks sent to them in 1955, at Miller’s request, by the purchaser of the royalty interest. According to Miller (corroborated by the Mire heir who had handled most of the arrangements between Miller and the Mire heirs in 1955), the Mire heirs were fully satisfied at the time. Oil was produced on the land a little later, however, and this suit was filed in 1958, more than three years later, which raised the belated contention that Donat Mire had not known that a mineral or a mineral royalty reservation in his favor had been omitted from the 1948 deed at the time it was executed by him.
The defendant Miller’s version of this 1955 royalty sale and distribution of half of the funds received by the Mire heirs is fully corroborated by the testimony of the Mire heir who handled many of the arrangements at the time. Corroborating testimony was also given by the notary who passed the royalty deed, who had been the defendant Miller’s tax consultant at the time.
Against this, testimony, the plaintiffs produced the testimony of another Mire coheir, his wife, and his brother-in-law, all of whom stated that the defendant Miller in 1955 had told them he was selling only one-half of the mineral royalty interest which had been omitted from the sale (i. e., a %4 royalty interest), and that he would execute a deed to the Mire heirs for the *770 other one-half if oil was discovered on the land. They admitted that, when oil was indeed discovered a month or so later, Miller informed them that by the 1955 royalty sale had been conveyed the entire mineral royalty interest that Donat Mire had originally intended to reserve.
The plaintiffs also rely heavily upon the testimony of, and a 1955 letter written by, a broker who had purchased the royalty interest sold by the defendant Miller, which reflected this broker’s interpretation of the defendant Miller’s conversations in 1955 as an acknowledgment that through error the 1948 deed had not contained a mineral reservation. As the trial court noted, this testimony, although strong, only represents this witness’s interpretation of the conversation with the defendant, and it does not by itself outweigh the likewise strong factual testimony to the contrary.
We agree with the trial court that the testimony produced by the plaintiffs, contradicted and explained by credible evidence to the contrary, does not satisfy the heavy burden of proof required to reform a written contract: for “in a sale of real property there is .a strong presumption that the deed as executed properly describes the property conveyed and he who alleges error in this regard must offer clear and convincing proof of such error”, Cockerham v. Aime, La.App. 1 Cir., 110 So.2d 238, 243.
As the trial court stated: “To hold that a gratuitous payment is an acknowl-edgement of error in the document as executed would be to condemn a benevolent attitude toward neighbors and friends of many years * * *. If it were indeed defendant’s intention to enrich himself by a favorable error not known to plaintiffs, he could have remained mute and retained all of the funds. Plaintiffs’ testimony and evidence in the court’s opinion simply support defendant’s testimony that there were negotiations concerning a mineral or royalty reservation prior to the execution of the act. However, they fall short of proving by strong and convincing evidence that vendor did not sign the act with full knowledge that the reservation was not contained therein and that he did not prior to signing same abandon this consideration for the execution of the sale.”
For the foregoing reasons, the judgment of the trial court is affirmed, at the cost of the plaintiffs-appellants.
Affirmed.

. Miller kept the other half of the proceeds of the royalty sale to compensate himself for the seven additional years beyond 1958 that the mineral royalty interests created by the 1955 royalty deed would nevertheless be valid, if production did not result before 1958. As stated, Miller intended to donate to the Mire heirs only what interest they would have hail if Mire had insisted on the royalty reservation in the 1948 deed, but he felt no moral obligation to donate them a greater interest, such as a royalty interest effective in 1955 for an additional ten years beyond such later date.